**ASSET SALE AND PURCHASE AGREEMENT**

# TABLE OF CONTENTS

Page

SECTION 1.    GLOSSARY / INTERPRETATION. ................................................................. 1
    1.1    Glossary ................................................................................................... 1
    1.2    Interpretation............................................................................................ 1

SECTION 2.    PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES. ............... 2
    2.1    Transferred Assets ................................................................................... 2
    2.2    Assumed Contracts ................................................................................... 2
    2.3    "As Is" Transaction................................................................................... 2
    2.4    Liabilities ................................................................................................. 3

SECTION 3.    PURCHASE PRICE. ...................................................................................... 4
    3.1    Amount ..................................................................................................... 4
    3.2    Payment of Purchase Price....................................................................... 4
    3.3    Utilities..................................................................................................... 4
    3.4    Allocation of Purchase Price.................................................................... 4

SECTION 4.    CLOSING. ....................................................................................................... 4
    4.1    Closing Date.............................................................................................. 4
    4.2    Transfer of Assets .................................................................................... 4

SECTION 5.    SELLER'S REPRESENTATIONS AND WARRANTIES. ............................ 5
    5.1    Authorization for Agreement.................................................................... 5
    5.2    Organization.............................................................................................. 5
    5.3    Title to Properties..................................................................................... 5
    5.4    No Litigation ............................................................................................ 6
    5.5    No Finder's Fee......................................................................................... 6
    5.6    Environmental Matters............................................................................. 6
    5.7    No Violations ............................................................................................ 6

SECTION 6.    REPRESENTATION AND WARRANTIES OF BUYER. ............................. 6
    6.1    Authorization for Agreement.................................................................... 6
    6.2    Organization.............................................................................................. 7
    6.3    No Violation.............................................................................................. 7
    6.4    Finder's Fees............................................................................................. 7
    6.5    No Litigation ............................................................................................ 7

SECTION 7.    COVENANTS OF SELLER............................................................................ 7
    7.1    Seller's Chapter 11 Bankruptcy Case ...................................................... 7
    7.2    Access ....................................................................................................... 8
    7.3    Notice of Developments ........................................................................... 8
    7.4    Efforts to Close ........................................................................................ 8
    7.5    Sales and Transfer Taxes ......................................................................... 8

Case 07-22733    Doc# 542    Filed 11/23/09    Page 2 of 64

SECTION 8.     CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS........................ 8
    8.1     Representations and Warranties True .................................................. 8
    8.2     Compliance with Agreement .............................................................. 8
    8.3     Material Adverse Effect ..................................................................... 9
    8.4     Assumed Contracts ............................................................................ 9
    8.5     Bankruptcy Court Approval ............................................................... 9
    8.6     Title Commitment and Survey ........................................................... 9
    8.7     Bond Purchase Transaction ............................................................... 9
    8.8     Forbearance and Bond Option Agreement ......................................... 9
    8.9     New CAFO Agreement ...................................................................... 9
    8.10    Global Settlement Agreement ............................................................ 9
    8.11    Financing Contingency ...................................................................... 9
    8.12    Closing Deliveries ........................................................................... 10

SECTION 9.     CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS.................... 10
    9.1     Representations and Warranties True ............................................... 10
    9.2     Compliance with Agreement ............................................................ 10
    9.3     Bankruptcy Court Approval ............................................................. 10

SECTION 10.    MISCELLANEOUS. ........................................................................... 10
    10.1    Survival Of Covenants, Agreements, Representations And Warranties............... 10
    10.2    Expenses .......................................................................................... 11
    10.3    Termination and Abandonment ........................................................ 11
    10.4    Status of Agreement After Termination ........................................... 11
    10.5    Inform of Litigation ......................................................................... 11
    10.6    Assignment ...................................................................................... 11
    10.7    Governing Law ................................................................................ 11
    10.8    Amendment and Modification .......................................................... 12
    10.9    Notices ............................................................................................. 12
    10.10   Entire Agreement ............................................................................ 12
    10.11   Successors ........................................................................................ 13
    10.12   Counterparts ..................................................................................... 13
    10.13   Headings ........................................................................................... 13
    10.14   Exhibits and Schedules .................................................................... 13
    10.15   Jurisdiction....................................................................................... 13
    10.16   Severability ...................................................................................... 13
    10.17   Construction..................................................................................... 13
    10.18   Further Assurances........................................................................... 14

Case 07-22733   Doc# 542   Filed 11/23/09   Page 3 of 64

<u>EXHIBITS</u>

Exhibit 1.1                Glossary

Exhibit 2.1                Transferred Assets

                                 Schedule 2.1(a) Transferred Real Estate

                                 Schedule 2.1(b) Personal Property

                                 Schedule 2.1(c) Assigned Claims

Exhibit 2.2                Assumed Contracts

Exhibit 3.4                Allocation of Purchase Price

Exhibit 5.3                Permitted Encumbrances

Exhibit 5.4                Litigation

Exhibit 5.6                Environmental Matters

Exhibit 5.7                Violations

Exhibit 8.5                Sale Order

Exhibit 8.10             Global Settlement Agreement

Case 07-22733   Doc# 624   Filed 11/23/09   Page 4 of 64

# ASSET SALE AND PURCHASE AGREEMENT

**THIS ASSET SALE AND PURCHASE AGREEMENT** (this "Agreement") is made and entered into this 17th day of December, 2009, by and between E3 BioFuels-Mead, LLC, a Nebraska limited liability company and E3 BioFuels-Mead Holding, LLC, a Nebraska limited liability company (collectively and individually "Seller"), and AltEn, LLC, a Kansas limited liability company ( "Buyer").

## WITNESSETH:

**WHEREAS,** Seller owns a facility for the production of denatured, anhydrous ethanol, alcohol, distillers grains, methane, aqueous ammonia, compost and certain other products (the "Business") located on real property (the "Premises") located in Mead, Nebraska, more specifically described in Exhibit 2.1 hereto. The facility is not currently operational.

**WHEREAS,** On November 20, 2007, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Kansas (Kansas City), Case No. 07-22733-RDB.

**WHEREAS,** Robert A. Carringer is the duly appointed and acting Chapter 11 Trustee for the Seller.

**WHEREAS,** Seller desires to sell, assign, transfer and convey to Buyer substantially all of its properties and assets, and Buyer desires to acquire such properties and assets, all upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto agree as follows:

## SECTION 1. GLOSSARY / INTERPRETATION.

1.1 **Glossary.** Exhibit 1.1 hereto, the terms of which are incorporated herein by reference, shall constitute the glossary of this Agreement (the "Glossary"), and any and all such terms when used in this Agreement, and/or any of its exhibits (which are incorporated herein by reference thereto) shall be used in accordance with the definitions ascribed to such terms in the Glossary. In addition to the definitions, the terms defined in the Glossary may contain material and substantive language, provisions and terms of this Agreement, and are to be read as any other term, paragraph, sentence, section, provision, etc. of this Agreement.

1.2 **Interpretation.** Whenever required by context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The used of the word including in this Agreement shall be by way of example rather than by limitation. Reference to any Agreement, document or instrument means such Agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof. Whenever required by the context, references to a fiscal year shall refer to a portion thereof.

Terms not set forth in Exhibit 1.1 but otherwise defined in the body of the Agreement shall have the specific meanings attributed to them in therein.

**SECTION 2.**    **PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**.

2.1   **Transferred Assets**. Subject to the terms and conditions hereof, and subject to the representations and warranties made herein, on the Closing Date Seller will sell, assign, transfer and convey to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the Transferred Assets, free and clear of all liens, claims and encumbrances, other than Permitted Encumbrances (which for the avoidance of doubt shall include the liens of the Bond Trustee securing the obligations under the Bond Documents).

2.2   **Assumed Contracts**. On the Closing Date, Seller shall assign pursuant to Section 365(f) of the Bankruptcy Code, and Buyer shall assume pursuant to Section 365(b) of the Bankruptcy Code, all of Seller's rights and obligations arising from and after the Closing Date under the Assumed Contracts, which shall be limited to:

        (1)    Patent License Agreement;

        (2)    Those Bond Documents to which Seller is a party (excluding the Original CAFO Agreement, the Project Operating Agreement, the Marketing Agreement (E3 Marketing), and the Marketing Agreement (Aventine); and

        (3)    Those contracts, agreements and leases identified on Exhibit 2.2 hereto.

            (a)    Seller shall obtain any consents required to assign the Assumed Contracts and shall cure prior to Closing any defaults required to assign the Assumed Contracts, other than the Patent License Agreement. Buyer shall pay the sum of Three Million Three Hundred Thousand ($3,300,000) representing all past due payments under the Patent License Agreement and all future license payments through June 30, 2010 subject to the schedule of payments set forth in Exhibit 2.2. Exhibit 2.2 hereto lists, to the Knowledge of Seller, all current defaults of Seller under the Assumed Contracts and Cure Amounts.

            (b)    To the extent a contract or lease not expressly identified on Exhibit 2.2 is identified, Buyer shall have the right but not the obligation to assume such contract or lease. Any contract or lease not expressly assumed by Buyer shall be deemed rejected by Seller and Buyer shall have no obligations thereunder.

2.3   **"As Is" Transaction**. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSFERRED ASSETS, THE ASSUMED CONTRACTS OR INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION THEREWITH, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY TANGIBLE PERSONAL PROPERTY OR ANY REAL PROPERTY OR IMPROVEMENTS ("REAL ESTATE") OWNED BY SELLER, THE ZONING OF ANY SUCH REAL ESTATE, THE VALUE OF

THE TRANSFERRED ASSETS (OR ANY PORTION THEREOF) OR PERMITTED ENCUMBRANCES AFFECTING THE TITLE TO THE TRANSFERRED ASSETS (OR ANY PORTION THEREOF). WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE TRANSFERRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE TRANSFERRED ASSETS AND OTHER MATTERS RELATING TO OR AFFECTING THE TRANSFERRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE TRANSFERRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. BUYER ACKNOWLEDGES THAT AN EXPLOSION THAT OCCURRED IN FEBRUARY OF 2007 DAMAGED THE PROJECT AND THAT THE PURCHASE PRICE FOR THE TRANSFERRED ASSETS HEREIN HAS BEEN ADJUSTED TO REFLECT THE "AS IS" CONDITION OF THE TRANSFERRED ASSETS. ACCORDINGLY, BUYER WILL ACCEPT THE TRANSFERRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**2.4**     **Liabilities**.

(a)     <u>Assumed Liabilities</u>.     Subject to the terms and conditions of this Agreement, Buyer hereby agrees, as of the Closing Date, to assume and discharge only those obligations and liabilities of Seller arising under Assumed Contracts for matters, events and obligations arising or accruing after the Closing Date, taxes due and payable on the Real Estate, if any, and Seller's obligations under the Bond Documents.

(b)     <u>Excluded Liabilities</u>.     Any and all other debts, obligations and liabilities of Seller, whether accrued or contingent or due or not due, which are not specifically assumed by Buyer under Section 2.4(a) above, shall be and remain the obligations and liabilities of Seller to pay or discharge, and Buyer shall not be obligated for them or be deemed to have assumed them by reason of the purchase of the Transferred Assets or otherwise. In particular Buyer shall not assume, nor have any responsibility with respect to (i) Seller's failure to comply with any federal, state or local laws or regulations, including those dealing with environmental matters or Hazardous Substances, (ii) any liability of Seller for sales, use and other taxes relating to periods prior to the Closing Date or the consummation of the transactions contemplated by this Agreement, (iii) any obligation of Seller to indemnify, defend, pay or guarantee the debts, losses, damages, expenses or liabilities of or asserted against or incurred by any person or entity, including indemnities in favor of present or former officers, directors, employees, agents, partners, trustees, insurers, lenders or other persons, whether arising out of statute, law, decree, order, agreement, bylaw, charter provision, operation of law or otherwise, (iv) any liability of Seller incurred or accrued for costs, expenses or claims in connection with this Agreement and the transactions contemplated by it, or termination or breach of any non-Assumed Contracts or otherwise arising out of any liability, contract or lease not

expressly assumed by Buyer; and (v) any liability or obligation arising pursuant to trade debt and other administrative expenses of the Bankruptcy Case.

## SECTION 3.   PURCHASE PRICE.

3.1   **Amount**.   The purchase price for the Transferred Assets (the "Purchase Price") shall consist of (i) assumption by Buyer of Seller's obligations under the Bonds; (ii) payment of the Cure Amount for the Patent License Agreement; (iii) payment of the estates' attorneys fees and expenses owed to Spencer Fane Britt and Browne LLP (not to exceed $68,000) incurred in connection with the Avoidance Actions; and (iv) cash in the amount of $150,000 and the Assumed Liabilities.   Within five business days of execution and delivery of this Agreement, Buyer shall pay the Deposit to the Debtor Trustee, which Deposit shall be held in escrow in an interest-bearing account by the Debtor Trustee pending Closing.   Upon Closing, Seller shall be entitled to the Deposit and any interest thereon.   If this Agreement and the transactions contemplated thereby are not approved by the Bankruptcy Court, or if this Agreement is terminated or abandoned as provided under Section 10.3 of this Agreement, the Deposit and any interest thereon shall be returned to Buyer, except as otherwise provided in Section 10.3.

3.2   **Payment of Purchase Price**.   At the Closing on the Closing Date, Buyer shall pay the cash portion of the Purchase Price, less the Deposit.

3.3   **Utilities**.   To the extent that such actions do not materially impact Buyer's operation of the Project, utilities for the Premises shall be read and terminated as of the Closing Date and Buyer shall institute new utility services in its own name.   Seller shall be entitled to return of its utility deposits and be responsible for payment of any unpaid utility services at the Premises for periods prior to the Closing Date.   Buyer shall be responsible for its own utility deposits.   Seller and Buyer shall cooperate with each other and the utility companies involved to insure uninterrupted transfer of service and Buyer's non-responsibility for Seller's utility bills.

3.4   **Allocation of Purchase Price**.   The Purchase Price shall be allocated as set forth in Exhibit 3.4 hereto for all purposes (including financial accounting and tax purposes).   Neither party shall take any contrary position regarding such final allocation in any tax filing or contest.

## SECTION 4.   CLOSING.

4.1   **Closing Date**.   The Closing shall take place at 10:00 a.m. on the Closing Date or such other date and location as the parties may mutually agree in writing, with the consent of the Bond Trustee, at the offices of Douthit Frets Rouse Gentile & Rhodes, LLC, 903 East 104th Street Suite 610, Kansas City, Missouri 64131, or at such other location as the parties may mutually agree.

4.2   **Transfer of Assets**.   At the Closing on the Closing Date, effective as of 11:59 p.m. on the Closing Date:

(a)   Seller shall sell, assign, transfer and convey to Buyer (or its designee) all of Seller's right, title and interest in and to the Transferred Assets and Assumed Contracts.   Such sale, assignment, transfer and conveyance shall be effected or evidenced by delivery by Seller to Buyer of applicable special warranty deeds, bills of sale,

assignments, certificates of title and vehicle registration, FIRPTA and other relevant affidavits and other documents reasonably acceptable in form and substance to Buyer and Seller. Buyer shall pay all applicable transfer, sales and use taxes on the transfer; provided. Except to the extent provided in Section 3.4, all ad valorem taxes, utility charges, rents and other amounts payable under the Assumed Contracts will be prorated as of Closing based on the most recent information available.

      (b)     Buyer shall assume the liabilities described in Section 2.4(a), but only to the extent provided in Section 2.4(a).

      (c)     Seller shall obtain, execute and deliver those documents and shall certify compliance with those requirements contained in Section 8.10 of this Agreement.

## SECTION 5.     SELLER'S REPRESENTATIONS AND WARRANTIES.

Seller hereby represents and warrants to Buyer as follows (except as set forth in the Exhibits and Schedules hereto):

    5.1    **Authorization for Agreement**.  Subject to Bankruptcy Court approval, the execution, delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary actions of Seller, and the consummation of the transactions contemplated hereby will have been duly and validly authorized by all necessary actions of Seller prior to the Closing. Subject to Bankruptcy Court approval, no other actions, approvals or proceedings are necessary to authorize the execution, delivery and performance of this Agreement by Seller. This Agreement has been duly executed and delivered by Seller. Subject to Bankruptcy Court approval, this Agreement is, and any documents or instruments to be executed and delivered by Seller pursuant hereto will at the time of such execution and delivery be, legal, valid and binding obligations of Seller enforceable in accordance with their respective terms.

    5.2    **Organization**.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nebraska. Subject to Bankruptcy Court approval, Seller has all requisite corporate power and authority to enter into this Agreement and to sell, assign, transfer and convey the Transferred Assets to Buyer under this Agreement and to otherwise perform its obligations hereunder. Except as set forth in the Exhibits and Schedules hereto, neither the execution and delivery of this Agreement nor the sale of the Transferred Assets by Seller requires the consent or approval of, the giving of notice to, the registration, filing or recording with or the taking of any other action by Seller in respect of any federal, state or local governmental authority.

    5.3    **Title to Properties**. Seller has good and marketable title to all of the Transferred Assets. At the Closing, Seller will transfer to Buyer good and marketable title to all of the Transferred Assets, free and clear of all liens, security interests, claims and encumbrances except for Permitted Encumbrances, identified in Exhibit 5.3 hereto, (which for the avoidance of doubt shall include the liens of the Bond Trustee securing the obligations under the Bond Documents). Seller shall give notice of the proposed sale of the Transferred Assets to all parties that have a

security interest in or, to Seller's Knowledge, a claim against, the Transferred Assets (or any portion thereof) and to all other parties entitled to receive notice under the Bankruptcy Code.

5.4    **No Litigation**.  Except as set forth in Exhibit 5.4 hereto, no suit, action or legal, administrative, arbitration or other proceeding or, to Seller's Knowledge, any investigation by any governmental or regulatory agency, pertaining to the Project or the Transferred Assets, is pending or, to Seller's Knowledge, has been threatened by or against Seller concerning or arising out of Seller's use, operation or ownership of the Project or the Transferred Assets.

5.5    **No Finder's Fee**.  Seller has not employed or retained any broker, agent, finder or other party, or incurred any obligation for brokerage fees, finder's fees or commissions  with respect to the transactions contemplated by this Agreement, or otherwise dealt with anyone purporting to act in the capacity of a finder or broker with respect thereto whereby Buyer may be obligated to pay such a fee or commission.

5.6    **Environmental Matters**.  Except as set forth in Exhibit 5.6 hereto, to Seller's Knowledge, (a) there are no Hazardous Substances located on the Premises except for substances which are properly contained and stored and used in compliance with all applicable Environmental Laws, (b) there are and have been no violations of or investigations concerning compliance with Environmental Laws asserted, cited or notified concerning any of the Transferred Assets or the past or present use, condition or operation of the Project or the Premises by any party, and (c) other than Buyer's environmental due diligence, there are no reports, investigations, assessments or other writings concerning compliance of the Premises or Transferred Assets, copies of which have not been furnished to Buyer.

5.7    **No Violations**.  Except as set forth in Exhibit 5.7 hereto, to Seller's Knowledge, (a) Seller's operation, use and ownership of the Premises and the Transferred Assets is in material compliance with all applicable laws, regulations, codes, orders and decrees, (b) there are no pending, threatened or asserted investigations or violations of any applicable laws, regulations, orders, ordinances, decrees, permits, or codes asserted against Seller in connection with its use, operation or ownership of the Transferred Assets, and (c) the sale of the Transferred Assets to Buyer pursuant to the terms of this Agreement will not violate, breach or cause a default under any applicable laws, regulations, orders, permits or codes, or the charter, bylaws or any agreement to which Seller is party or any of the Transferred Assets are subject.  Seller has no Knowledge of (i) any reason why Buyer could not obtain necessary permits and rights for operating the Project as it is presently operated by Seller, (ii) any termination or modification of any license, zoning, use or permit of the Project as it is presently operated by Seller, and (iii) any additional restrictions or loss of rights that would likely occur with respect to Buyer's right, title and interest in, or Buyer's operation or use of, the Project or any of the Transferred Assets as a result of a change in ownership of the Project or the Transferred Assets.

## SECTION 6.    REPRESENTATION AND WARRANTIES OF BUYER.

Buyer represents and warrants to Seller as follows:

6.1    **Authorization for Agreement**.  The execution, delivery and performance of this Agreement by Buyer has been duly authorized by all necessary actions of Buyer, and the

consummation of the transactions contemplated hereby will have been duly authorized by all necessary actions of Buyer prior to the Closing. No other actions, approvals or proceedings are necessary to authorize the execution, delivery and performance of this Agreement by Buyer. This Agreement has been duly executed and delivered by Buyer. This Agreement is, and any documents or instruments to be executed and delivered by Buyer pursuant hereto will at the time of such execution and delivery be, legal, valid and binding obligations of Buyer enforceable in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium, or similar laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the availability of equitable remedies.

6.2 **Organization**. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Kansas. Buyer has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby by Buyer requires the consent or approval of, the giving of notice to, registration, filing or recording with or the taking of any other action by Buyer in respect of any federal, state or local governmental authority.

6.3 **No Violation**. The execution and delivery of this Agreement and all other agreements, instruments and documents contemplated hereby by Buyer and the consummation of the transactions contemplated hereby and thereby will not conflict with or violate or constitute a breach or default under the articles of association of Buyer or any provision of any mortgage, trust indenture, lien, lease, agreement, instrument, or court order, judgment or decree to which Buyer is bound.

6.4 **Finder's Fees**. Buyer has not employed or retained any broker, agent, finder or other party or incurred any obligation for brokerage fees, finder's fees or commissions with respect to the transactions contemplated by this Agreement, or otherwise dealt with anyone purporting to act in the capacity of a finder or broker with respect thereto whereby Buyer or Seller may be obligated to pay such a fee or a commission.

6.5 **No Litigation**. No suit, action or legal, administrative, arbitration or other proceeding or, to Buyer's Knowledge, no investigation by any governmental agency, is pending or, to Buyer's Knowledge, has been threatened by or against Buyer which would materially and adversely affect the ability of Buyer to consummate the transaction provided for in this Agreement.

**SECTION 7. COVENANTS OF SELLER**.

7.1 **Seller's Chapter 11 Bankruptcy Case**. This Agreement and the transactions contemplated thereby are contingent upon the approval and authorization of the Bankruptcy Court. Seller agrees to file a motion within 7 days after the date hereof to seek approval by the Bankruptcy Court of the sale and transactions contemplated hereby. Seller agrees to cooperate with Buyer in accordance with the terms of this Agreement and support the entry of an order (and not withdraw any motion) seeking the Bankruptcy Court's approval of the sale of the

Transferred Assets to Buyer. Seller shall promptly advise Buyer of any written objections filed with the Bankruptcy Court to this Agreement.

   7.2   **Access**.   From and after the date of this Agreement until the Closing Date, Seller shall, upon reasonable advance notice from Buyer, afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives, reasonable access during normal business hours to the Transferred Assets and all records pertaining to the Project and the Transferred Assets. Buyer expressly acknowledges that nothing in this Section is intended to give rise to any contingency to Buyer's obligations to proceed with the transactions contemplated herein. Buyer shall have the right immediately prior to Closing to inspect the Project and Transferred Assets to determine compliance with the terms and conditions of Section 8 of this Agreement and to ascertain that the Transferred Assets are on the Premises at the time of Closing.

   7.3   **Notice of Developments**.   Seller shall give Buyer prompt written notice of any material adverse development, event or omission causing a breach of any of its own representations and warranties or its inability to meet the closing conditions set forth in Section 8 hereof.

   7.4   **Efforts to Close**.   Subject to the terms and conditions of this Agreement, Seller agrees to use commercially reasonable good faith efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws, regulations and agreements to (i) consummate and make effective the transactions contemplated by this Agreement, and (ii) maintain the Assumed Contracts and cure all breaches thereunder prior to Closing.

   7.5   **Sales and Transfer Taxes**.   Buyer shall be responsible for and agrees to pay when due all transfer taxes arising out of the transfer of the Transferred Assets by Seller and the other transactions contemplated herein. The parties have allocated the Purchase Price as set forth on Schedule 3.4, based on fair market value.

**SECTION 8.   CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS.**

   The obligations of Buyer at the Closing hereunder are subject, at Buyer's election, to the satisfaction on or prior to the Closing Date of the conditions set forth below. Notwithstanding the failure of any one or more of such conditions (other than the approval of the Bankruptcy Court), Buyer may nevertheless proceed with Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver.

   8.1   **Representations and Warranties True**.   The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date without taking into account any disclosures by Seller of any discoveries, events or occurrences arising on or after the date hereof.

   8.2   **Compliance with Agreement**.   Seller shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by it prior to or on the Closing Date.

8.3     **Material Adverse Effect**.  There shall not have occurred and be continuing any Material Adverse Effect.

8.4     **Assumed Contracts**.  The Assumed Contracts shall remain in full force and effect, without change or modification except as otherwise provided in Section 7.3 hereto, and Seller shall have cured all breaches thereunder.  All Cure Costs shall have been satisfied in accordance with Section 2.2 hereto.

8.5     **Bankruptcy Court Approval**.  This Agreement and the transactions contemplated hereby shall have been approved and authorized by the Bankruptcy Court as provided in Section 7.1 hereof, and the orders approving and authorizing this Agreement and the transactions contemplated hereby (such order, the "Sale Order") shall have been entered on or before February 1, 2010 (or such later time to which Buyer consents in writing) and shall not be stayed.  The Sale Order in a form substantially similar to that set forth in [Exhibit 8.5] hereto, shall have been approved by Buyer in writing, shall authorize the sale of the Transferred Assets and the assignment of the Assumed Contracts to Buyer in accordance with the provisions of this Agreement, free and clear of all liens, claims and encumbrances, except for Permitted Encumbrances, which for the avoidance of doubt shall include the liens of the Bond Trustee securing the Seller's obligations under the Bond Documents, pursuant to Sections 363(b) and (f) of the Bankruptcy Code, and shall contain a "good faith" finding as to Buyer pursuant to Section 363(m) of the Bankruptcy Code.

8.6     **Title Commitment and Survey**.  The title commitment and survey shall not disclose any liens, encumbrances or defects of title affecting the Transferred Real Estate other than (i) those disclosed in the pro forma title policy, the title reports or the surveys; (ii) Permitted Encumbrances; (iii) those to be released by the Sale Order issued by the Bankruptcy Court; and (iv) those disclosed in the title reports or surveys that will not result in a Material Adverse Effect on Buyer's use and enjoyment of the Transferred Real Estate or the other Transferred Assets.

8.7     **Bond Purchase Transaction**.  All transactions contemplated in that certain Bond Purchase Agreement between Buyer or its designee and CIT Group/Equipment Financing, Inc. ("CIT") have been consummated and CIT shall have transferred to Buyer or its designee all of its respective right, title and interest in the Bonds.

8.8     **Forbearance and Bond Option Agreement**.  Mead OPP Bond Acquisition, LLC or its designees shall have executed a Forbearance and Bond Option Agreement, in a form satisfactory to Buyer, in its sole discretion, at or prior to the execution of this Agreement.

8.9     **New CAFO Agreement**.  Buyer shall have negotiated, to Buyer's satisfaction in its sole discretion, a New CAFO Agreement with Mead Cattle Company, LLC.

8.10    **Global Settlement Agreement**.  A Global Settlement Agreement (GSA), a form substantially similar to that set forth in **[Exhibit 8.10]** hereto, which shall have been approved and authorized by the Bankruptcy Court by a final, non-appealable order which shall not be stayed, shall have been executed by all parties thereto.

8.11    **Financing Contingency**.  Buyer shall have obtained third party financing of up to $6.0 million on terms and conditions satisfactory to Buyer in its sole and absolute discretion.

8.12　**Closing Deliveries**.  On the Closing Date, Seller shall deliver to Buyer all of the following:

(a)　Duly executed bill of sale, special warranty deed and such other instruments of conveyance, transfer, assignment and delivery as Buyer shall have reasonably requested pursuant to Section 4.2(a) hereof;

(b)　a certified copy of the Sale Order approving this Agreement and all of the transactions contemplated hereby;

(c)　Duly executed Assumption and Assignment of the Patent License Agreement;

(d)　Duly executed Global Settlement Agreement;

(e)　Duly executed Assumption and Assignment Agreement for Assumed Contracts, other than the Patent License Agreement; and

(f)　such other certificates, documents and instruments as Buyer reasonably requests related to the transactions contemplated hereby.

## SECTION 9.　　CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS.

The obligations of Seller at the Closing hereunder are subject, at Seller's election, to the satisfaction on or prior to the Closing Date of the conditions set forth below.  Notwithstanding the failure of any one or more of such conditions, Seller may nevertheless proceed with Closing without satisfaction, in whole or in part, of any one or more of such conditions and without written waiver.

9.1　**Representations and Warranties True**.  The representations and warranties made by Buyer in this Agreement  shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.

9.2　**Compliance with Agreement**.  Buyer shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by it prior to or on the Closing Date.

9.3　**Bankruptcy Court Approval**.  This Agreement and the transactions contemplated thereby shall have been approved by the Bankruptcy Court as provided in Section 7.1.

## SECTION 10.　　MISCELLANEOUS.

10.1　**Survival Of Covenants, Agreements, Representations And Warranties**.  The representations and warranties contained in this Agreement shall not survive the Closing; provided, however, all of Buyer's covenants and obligations contained in Section 2 shall survive the Closing indefinitely.

10.2 **Expenses**. Each of the parties hereto agrees to be responsible for its own, without right of reimbursement from the other, costs incurred by it incident to the performance of its obligations hereunder, whether or not the transactions contemplated by this Agreement shall be consummated, including, without limitation, those costs incident to the preparation of this Agreement, and the fees and disbursements of legal counsel, accountants and consultants employed by the respective parties in connection with the transactions contemplated by this Agreement.

10.3 **Termination and Abandonment**. This Agreement may be terminated and abandoned on or prior to the Closing Date as follows: (a) by mutual written consent of the parties hereto, (b) by Seller if the conditions precedent contained in Section 9 hereof have not been fulfilled on or prior to the Closing, (c) by Buyer if the conditions precedent contained in Section 8 hereof have not been fulfilled on or prior to the Closing Date, or (d) by either party if either approval of the Bankruptcy Court is not obtained on or before February 1, 2010, or if Closing has not occurred by February 12, 2010, for reasons other than the breach or default by the terminating party of its obligations under this Agreement. In the event of termination by any party as provided above, written notice shall promptly be given to the other party and each party shall pay its own expenses incident to the preparation for the consummation of this Agreement and the transactions contemplated hereby. **IF THE CLOSING DOES NOT OCCUR DUE TO THE FAILURE OF BUYER TO CLOSE IN BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT, THE DAMAGES THAT SELLER MAY CLAIM AS A RESULT OF SUCH BREACH SHALL BE LIQUIDATED AND LIMITED TO THE AMOUNT OF THE DEPOSIT AND THE PARTIES AGREE THAT SUCH AMOUNT CONSTITUTES REASONABLE LIQUIDATED DAMAGES FOR BUYER'S WRONGFUL FAILURE TO CLOSE, IS THE SOLE AND EXCLUSIVE REMEDY AVAILABLE TO SELLER AND SELLER HEREBY WAIVES ANY RIGHT TO SEEK CONSEQUENTIAL DAMAGES.**

10.4 **Status of Agreement After Termination**. Upon any termination of this Agreement pursuant to Section 10.3, this Agreement shall become void and shall have no effect; except for those obligations in Section 10 hereof, which shall survive the termination of this Agreement in accordance with its terms.

10.5 **Inform of Litigation**. During the period from the date of this Agreement to the Closing Date, each party will promptly inform the other party in writing of any litigation commenced against such party in respect of the transactions contemplated by this Agreement.

10.6 **Assignment**. This Agreement shall not be assigned by either party without the prior written consent of the other party and any attempted assignment without such written consent shall be null and void and without legal effect.

10.7 **Governing Law**. This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Kansas applicable to agreements made and to be performed entirely within such state, including all matters of construction, validity and performance.

10.8  **Amendment and Modification**.  Buyer and Seller may amend, modify and supplement this Agreement in such manner as may be mutually agreed by them in writing, subject to consent of the Bond Trustee.

10.9  **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to be duly given if delivered by hand, if mailed by certified or registered mail with postage prepaid, if delivered by fax (with confirmation confirmed) or if sent by nationally-recognized overnight courier as follows:

> If to Seller:
>
> Robert A. Carringer, Chapter 11 Trustee
> CRG Partners
> Houston, TX
> FAX: 866-316-5644
>
> With a copy to:
>
> Jeffrey A. Deines
> Lentz Clark Deines PA
> 9260 Glenwood
> Overland Park, KS 66212
> Fax: 913.648.0664
>
> If to Buyer:
>
> AltEn, LLC
> Attn: Scott Asner
> 903 East 104th Street Suite 630
> Kansas City, Missouri 64131
> Fax: 816-941-6666
>
> With a copy to:
>
> Robert S. Herman, Esq.
> Douthit Frets Rouse Gentile & Rhodes, LLC
> 903 East 104th Street Suite 610
> Kansas City, Missouri 64131
> Fax: 816-941-6666

or to such other addresses as either party may provide to the other in writing.

10.10  **Entire Agreement**.  The terms of all of the exhibits and schedules attached hereto are incorporated herein and made a part of this Agreement.  Except for any confidentiality agreements between the parties (which shall survive the execution and delivery of this Agreement), this Agreement cancels, merges and supersedes all prior and contemporaneous understandings and agreements relating to the subject matter of this Agreement, written or oral,

between the parties hereto and contains the entire agreement of the parties hereto, and the parties hereto have no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein.

10.11 **Successors**. This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and to their respective successors and permitted assigns. In the event that Seller's Chapter 11 case should be converted to a case under Chapter 7, the obligations of Seller hereunder shall be binding upon such trustee or successor Chapter 7 estate.

10.12 **Counterparts**. This Agreement may be executed in one or more counterparts each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.

10.13 **Headings**. The headings used in this Agreement are for convenience only and shall not constitute a part of this Agreement.

10.14 **Exhibits and Schedules**. All of the exhibits and schedules attached hereto are incorporated herein and made a part of this Agreement by reference.

10.15 **Jurisdiction**. During Seller's Bankruptcy Cases, any suit, action or proceeding between the parties hereto relating to this Agreement or to any agreement, document or instrument delivered pursuant hereto or in connection with the transactions contemplated hereby, or in any other manner arising out of or relating to the transactions contemplated by or referenced in this Agreement shall be commenced and maintained exclusively in the Bankruptcy Court. The parties hereto submit themselves unconditionally and irrevocably to the personal jurisdiction of such court. Subsequent to Seller's Bankruptcy Cases, any suit, action or proceeding between the parties hereto relating to this Agreement or to any agreement, document or instrument delivered pursuant hereto or in connection with the transactions contemplated hereby, or in any other manner arising out of or relating to the transactions contemplated by or referenced in this Agreement shall be commenced and maintained exclusively in the United States District Court for the District of Kansas, or if that court lacks jurisdiction over the subject matter, in a state court of competent subject matter jurisdiction sitting in Wyandotte County, Kansas. The parties hereto submit themselves unconditionally and irrevocably to the personal jurisdiction of such courts, as applicable. The parties further agree that venue shall be in the District of Kansas. The parties hereto irrevocably waive any objection to such personal jurisdiction or venue, including, but not limited to, the objection that any suit, action or proceeding brought in the District of Kansas, has been brought in an inconvenient forum.

10.16 **Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, each of which shall remain in full force and effect.

10.17 **Construction**. This Agreement has been freely and fairly negotiated among the parties. If an ambiguity or question of intent or interpretation arises this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provisions of this Agreement.

10.18 **Further Assurances**. Seller agrees that, after the Closing, it shall execute and deliver, and shall otherwise cause to be executed and delivered, from time to time, such further instruments, notices, and other documents, and do such other and further acts and things, as may be reasonably necessary to fully and effectively grant, convey and assign the interest in the Transferred Assets to Buyer.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

SELLER

E³ BIOFUELS-MEAD, LLC

By: _____

Robert A. Carringer, Chapter 11 Trustee for
E3 BioFuels-Mead, LLC

And

E³ BIOFUELS-MEAD, HOLDING, LLC

By: _____

Robert A. Carringer, Chapter 11 Trustee for
E3 BioFuels-Mead Holding, LLC

BUYER

ALTEN, LLC


By: _~~~Scott Asner~~~_ authorized representative
Name: Scott L. Asner
Title: authorized representative

**Exhibit 1.1**

## GLOSSARY

"Affiliate" as applied to any Entity, means any other Entity directly or indirectly controlling, controlled by or under common control with that Entity. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" or "under common control") as applied to any Entity, means the possession, either directly or indirectly, of the power to direct or cause the direction of the management and policies of that Entity, whether through ownership of voting securities, by contract or otherwise. For purposes of this definition, a person shall be deemed to be controlled by such Entity if such Entity possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors of such Entity.

"Assumed Contracts" means only those contracts agreements and leases set forth or described in [Exhibit 2.2] hereto.

"Avoidance Actions" means any and all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law, including, without limitation, all rights and avoidance claims of Debtors arising under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Case" means Case Nos. 07-22733-RDB and 07-22734-RDB filed by the Debtors in the Bankruptcy Court.

"Bankruptcy Code" means the United States Bankruptcy Code (Title 11 of the United States Code) as in effect on the date hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Kansas (Kansas City).

"Bonds" means, collectively, the County of Sanders, Nebraska $45,745,000 Tax-Exempt Industrial Development Revenue Bonds (E3 BioFuels-Mead, LLC Project) Series 2006A, and the County of Saunders, Nebraska $4,755,000 Tax-Exempt Industrial Development Revenue Bonds (E3 BioFuels-Mead, LLC Project) Series 2006B, issued in connection with the Project.

"Bondholders" means the holders of the Bonds.

"Bond Documents" means that certain Bond Trust Indenture, Lease Agreement, Base Lease Agreement, Guaranty Agreement, Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, and any other agreements entered into by Seller in connection with the Bonds.

"Bond Trust Indenture" means the Trust Indenture dated as of December 1, 2006 between Bond Indenture Trustee and the County of Saunders, Nebraska, relating to the Bonds.

"Bond Trustee" means Wells Fargo Bank, National Association, in its capacity as indenture trustee pursuant to the Bond Trust Indenture.

"Causes of Action" means any action, cause of action, liability, obligation, right to legal or equitable remedies, suit, debt, sum of money, damage, judgment, claim or demand whatsoever, whether known or unknown, matured or unmatured, disputed or undisputed and whether asserted or assertable directly or derivatively, whether asserted or which could be asserted, in law, equity or otherwise, whether arising under Chapter 5 of the Bankruptcy Code or arising under any other legal or equitable theory, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Bankruptcy Case.

"Claim(s)" shall mean any and all legal, statutory, administrative, equitable and/or regulatory claims, disputes, pleas, demands, causes of action, Causes of Action, action(s), liens, prayers for relief, encumbrances, interests, and/or claims of any kind whatsoever, including (to the maximum extent permitted by law or equity), but not limited to, those claims arising as a result the application of or under the following legal concepts: breach of warranty(s), negligence, gross negligence, tort law, fraud, errs and/or omissions, professional design errors, construction errors, attempted Startup errors, breach of securities law, breach of criminal law, breach of contract, and any and all other legal or equitable claims, demands, causes of action, action(s), and/or interests whatsoever.

"Closing" means the closing of the transactions contemplated by this Agreement.

"Closing Date" means the second business day following the satisfaction of all conditions precedent to the consummation of the transactions contemplated by this Agreement (as set forth in Sections 8 and 9 of this Agreement), but in no event later than February 12, 2010, or such other date as the parties may mutually agree upon in writing with the consent of the Bond Trustee.

"Cure Amounts" means  any amounts due under any Assumed Contract including without limitation, any amounts necessary to cure existing pre-petition and post-petition defaults which are required to be cured or paid in order to assume the Assumed Contracts, if any.

"Debtors" shall mean E3 BioFuels-Mead, LLC and E3 BioFuels-Mead Holding, LLC.

"Debtor Trustee" means the duly appointed and acting Chapter 11 Trustee for the Debtors.

"Deposit" means the deposit in the amount of $15,000 delivered to Debtor Trustee by Buyer as provided in Section 3.1 of this Agreement.

"E3BFM" means E3 BioFuels-Mead, LLC, a Nebraska limited liability company.

"E3BFMH" means E3 BioFuels-Mead Holding, a Nebraska limited liability company.

"Entity" means any natural person(s), individual(s), corporation(s) of any type, limited liability company(s), limited partnership(s), general partnership(s), association(s), joint venture(s), trust(s), trust company(s), trustee(s)s (including the Debtor Trustee and the Bond Trustee), estate(s), governmental authority, juridicial entity or organization(s) or other

organization(s), whether or not legal organizations. Entity shall be broadly construed as any entity or any combination of entities.

"Environmental Laws" means any and all present and future federal, state and local laws (whether under common law, statute, rule, regulation or otherwise), requirements under permits issued with respect thereto, and other requirements of any appropriate governmental authorities relating to the environment, or to any Hazardous Substance or to any activity involving Hazardous Substances, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. (CERCLA), the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., the Clean Water Act, 33 U.S.C. 1251 et seq., the Clean Air Act, 42 U.S.C. 7401 et seq., the Toxic Substance Control Act, 15 U.S.C. 2601 et seq., and the Safe Drinking Water Act, 42 U.S.C. 300f through 300j, as all of the foregoing may be amended from time to time.

"Global Settlement Agreement" or "GSA" means that certain agreement between the Debtors, the Debtor Trustee, certain E3 Non-Debtor Parties (as defined therein) and others, in the form attached hereto as Exhibit 8.10.

"Hazardous Substances" means any chemical, compound, material, mixture, living organism or substance that is now or hereafter defined or listed in, or otherwise classified pursuant to, any "Environmental Laws" as a "hazardous substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity or toxicity, including any petroleum, polychlorinated biphenyls, asbestos, radon, natural gas, natural gas liquids, liquefied natural gas or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

"Knowledge" means with respect to Seller, the actual knowledge of the Debtor Trustee and John Curran, and with respect to Buyer, the actual knowledge of its executive officers, in each case after reasonable inquiry of appropriate personnel of the facts or matters represented.

"Material Adverse Effect" means any chance or effect that is material and adverse to (i) the Transferred Assets, including any casualty loss, (ii) the Business; (iii) the ability of Seller to perform its obligations hereunder.

"New CAFO Agreement" means that certain CAFO and Solid Waste Disposal Agreement by and between Buyer and Mead Cattle Company, LLC, effective upon Closing.

"Patent License Agreement" means that certain License Agreement, dated December 1, 2006, by and between Seller and IBR Patent Holding, LLC, as amended, and assumed by Seller with approval of the Bankruptcy Court, and assigned to buyer at Closing.

"Permitted Encumbrances" means all matters disclosed on Exhibit 5.3 hereto.

"Project" shall mean the integrated solid waste and bio-fuels facility in Mead, Nebraska, consisting a the following major components: i) an ethanol plant, ii) a wet cake production and

distribution system, iii) a manure collection system, iv) an anaerobic digester and methane collection system, and v) anhydrous ammonia and compost production systems.

"Purchase Price" has the meaning assigned to that term in Section 3.1 of this Agreement.

"Seller" means E3BFM and E3BFMH.

"Tax Code" means Title 26 of the United States Code.

"Transferred Assets" means any and all assets and interests owned or held by Seller which are used in the operation of the Business, including but not limited to the Transferred Real Estate, Assumed Contracts, personal property and other property rights identified or described in Exhibit 2.1, Schedules 2.1(a), 2.1(b) and 2.1(c).

"Transferred Real Estate" means all real property and interests in real property owned or leased by Seller specifically identified and/or legally described in Exhibit 2.1, Schedule 2.1(a), including all buildings, fixtures, structures and other improvements thereon, together with any easements, appurtenances, licenses, servitudes, tenancies, options, rights of way and other real property rights, privileges or interests relating thereto.

Exhibit 2.1

**Transferred Assets**

The Transferred Real Estate described in Schedule 2.1(a) hereto.

All personal property, including but not limited to, that identified and/or described on Schedule 2.1(b) hereto.

The Transferred Assets include all of Seller's right, title and interest in Avoidance Actions and Claims, including but not limited to those Claims specifically identified on Schedule 2.1(c) hereto.

Transferred Assets shall also include:

All inventory, including raw materials, work in progress and finished goods and all supplies relating to the maintenance of the Project.

All accounts and accounts receivable arising out of or relating to the Business.

All machinery, equipment, furniture, computers, office equipment, fixtures, leasehold improvements and related tools, spare parts and equipment used in the Business and other fixed assets owned or leased by Seller.

All spare parts, replacement parts miscellaneous items of personal property located on the Premises and used or held for use in connection with operation of the Business.

All prepaid expenses, deposits, rent and utility deposits and deferred charges owned for use in connection with, or relating to the Business including without limitation, prepaid insurance premiums.

All permits, licenses and regulatory approvals, to the extent transferrable or assignable, for the construction, ownership, operation, management and maintenance of the Project and the Transferred Assets, and the Seller's interest in any bonds or deposits posted in connection therewith.

All intangible and intellectual property related to the Business, including without limitation, telephone numbers, domain names, websites, trade names, service marks, copyrights, patents, customer lists, marketing materials, formulas, samples, customer requirements and pricing, customer prototypes, outstanding customer proposals, warranties, indemnities, software, operating systems and similar items, trade secrets, know-how, applications for any of the foregoing, as well as infringement or similar claims related to any of the foregoing.

All books and records relating to the Business including without limitation the books of account, tax, general, financial, accounting and personnel records, files, invoices, customer (current or prospective) and supplier lists, business plans, marketing studies and other written information.

All guaranties, warranties, representations, claims, plans, specifications, blueprints, service manuals, maintenance records and other documentation, whether in computer, electronic or paper form, related to the Transferred Assets.

Transferred Assets shall include any assets or interests owned or held by the Seller not specifically identified in these Exhibits and Schedules, but Buyer shall have the right, but not the obligation, to accept or reject any asset or interest not specifically identified in these Exhibits and Schedules. Transferred Assets shall include any assets or interests owned or held by the Seller not specifically identified in these Schedules and Exhibits unless such asset or interest is subsequently identified and Buyer expressly rejects such asset or interest.

Transferred Assets shall not include any funds held under the Bond Trust Indenture.

**Schedule 2.1(a)**

## TRANSFERRED REAL ESTATE

Seller's fee simple ownership interest in the following described real property and all improvements and fixtures thereon together with all rights appurtenant to the Premises, including, without limitation, any rights of Seller in any adjacent street, alley and right of way and any off-Premises improvements, more particularly described, to wit:

A TRACT OF LAND LOCATED IN SECTION 12, TOWNSHIP 14 NORTH, RANGE 8 EAST OF THE SIXTH P.M. SAUNDERS COUNTY, NEBRASKA, BEING DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION 12; THENCE S86°28'38"E (ASSUMED BEARING) ON THE NORTH LINE OF THE NORTHWEST QUARTER OF SAID SECTION 12, A DISTANCE OF 2702.78 FEET TO THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 12; THENCE S87°48'28"E ON THE NORTH LINE OF SAID NORTHEAST QUARTER, A DISTANCE OF 2837.68 FEET TO THE NORTHEAST CORNER OF SAID NORTHEAST QUARTER; THENCE S00°03'34"W ON THE EAST LINE OF SAID NORTHEAST QUARTER, A DISTANCE OF 2641.98 FEET TO THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 12; THENCE S00°04'47"W ON THE EAST LINE OF SAID SOUTHEAST QUARTER, A DISTANCE OF 710.38 FEET; THENCE N89°16'07"W, A DISTANCE OF 820.00 FEET; THENCE N00°43'53"E, A DISTANCE OF 840.00 FEET; THENCE N89°16'07"W, A DISTANCE OF 840.00 FEET; THENCE S09°18'57"W, A DISTANCE OF 150.00 FEET; THENCE S16°53'18"W, A DISTANCE OF 160.00 FEET; THENCE S00°43'53"W, A DISTANCE OF 173.00 FEET; THENCE N89°16'07"W, A DISTANCE OF 936.34 FEET; THENCE S03°35'54"W, A DISTANCE OF 267.34 FEET; THENCE N89°43'22"W, A DISTANCE OF 1459.11 FEET; THENCE N00°16'38"E, A DISTANCE OF 440.00 FEET; THENCE N89°43'22"W, A DISTANCE OF 315.00 FEET; THENCE S00°16'38"W, A DISTANCE OF 440.00 FEET; THENCE N89°43'22"W, A DISTANCE OF 986.36 FEET; TO A POINT ON THE WEST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 12; THENCE N01°19'42"W ON SAID WEST LINE, A DISTANCE OF 1183.66 FEET TO THE SOUTHWEST CORNER OF SAID NORTHWEST QUARTER; THENCE N01°19'50"W ON THE WEST LINE OF SAID NORTHWEST QUARTER, A DISTANCE OF 2663.80 FEET TO THE TRUE POINT OF BEGINNING, CONTAINING 438.12 ACRES, MORE OR LESS.

[to be supplemented prior to February 1, 2010]

## ASSIGNED
## PERSONAL PROPERTY

All of the personal property and fixtures on the Mortgaged Property described herein, including but not limited to: i) "Personal Property" as defined and secured by the "Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing" filed of record in Book 350, Page 1340 in the Office of Registered Deeds of Saunders County, Nebraska on December 22, 2006; ii) the ethanol production plant and facilities; iii) the anaerobic digestion facilities; iv) the nutrient recovery facilities; v) etc. Mortgaged Property as the term is used herein consists of the following:

A TRACT OF LAND LOCATED IN SECTION 12, TOWNSHIP 14 NORTH, RANGE 8 EAST OF THE SIXTH P.M. SAUNDERS COUNTY, NEBRASKA, BEING DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION 12; THENCE S86°28'38"E (ASSUMED BEARING) ON THE NORTH LINE OF THE NORTHWEST QUARTER OF SAID SECTION 12, A DISTANCE OF 2702.78 FEET TO THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 12; THENCE S87°48'28"E ON THE NORTH LINE OF SAID NORTHEAST QUARTER, A DISTANCE OF 2837.68 FEET TO THE NORTHEAST CORNER OF SAID NORTHEAST QUARTER; THENCE S00°03'34"W ON THE EAST LINE OF SAID NORTHEAST QUARTER, A DISTANCE OF 2641.98 FEET TO THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 12; THENCE S00°04'47"W ON THE EAST LINE OF SAID SOUTHEAST QUARTER, A DISTANCE OF 710.38 FEET; THENCE N89°16'07"W, A DISTANCE OF 820.00 FEET; THENCE N00°43'53"E, A DISTANCE OF 840.00 FEET; THENCE N89°16'07"W, A DISTANCE OF 840.00 FEET; THENCE S09°18'57"W, A DISTANCE OF 150.00 FEET; THENCE S16°53'18"W, A DISTANCE OF 160.00 FEET; THENCE S00°43'53"W, A DISTANCE OF 173.00 FEET; THENCE N89°16'07"W, A DISTANCE OF 936.34 FEET; THENCE S03°35'54"W, A DISTANCE OF 267.34 FEET; THENCE N89°43'22"W, A DISTANCE OF 1459.11 FEET; THENCE N00°16'38"E, A DISTANCE OF 440.00 FEET; THENCE N89°43'22"W, A DISTANCE OF 315.00 FEET; THENCE S00°16'38"W, A DISTANCE OF 440.00 FEET; THENCE N89°43'22"W, A DISTANCE OF 986.36 FEET; TO A POINT ON THE WEST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 12; THENCE N01°19'42"W ON SAID WEST LINE, A DISTANCE OF 1183.66 FEET TO THE SOUTHWEST CORNER OF SAID NORTHWEST QUARTER; THENCE N01°19'50"W ON THE WEST LINE OF SAID NORTHWEST QUARTER, A DISTANCE OF 2663.80 FEET TO THE TRUE POINT OF BEGINNING, CONTAINING 438.12 ACRES, MORE OR LESS.

2006 Komatsu Skidsteer/Model SK 1026
2006 Komatsu Wheel Loander/Model 320
2000 Lund – Boat for Lagoon
1981 Ford F-150 Pick-Up Truck
2006 Brown Bear Composter/Model SC 4912

IT Equipment
Office Equipment & Furniture
Spare Parts
Tools
Lab Equipment & chemicals
Plant Production Chemicals (flocullant, alpha amylase, etc.)
Ethanol
Corn
Fuel Oil #1
Woodchips
Straw/hay

## ASSIGNED Claims

The terms herein shall be ascribed the definitions given thereto in the Asset Sale and Purchase Agreement (Agreement). Additionally, the following terms as used herein shall be defined as follows:

Claim(s). Claim(s) shall mean any and all legal, statutory, administrative, equitable and/or regulatory claims, disputes, pleas, demands, causes of action, "Causes of Action" as defined in the Agreement, action(s), liens, prayers for relief, encumbrances, interests, and/or claims of any kind whatsoever, including (to the maximum extent permitted by law or equity), but not limited to, those claims arising as a result the application of or under the following legal concepts: breach of warranty(s), negligence, gross negligence, tort law, fraud, errs and/or omissions, professional design errors, construction errors, attempted Startup errors, breach of securities law, breach of criminal law, breach of contract, and any and all other legal or equitable claims, demands, causes of action, action(s), and/or interests whatsoever; except that such Claim(s), if any, as they exist against any "E3 Non-Debtor Party(s)" as defined in the GSA are expressly excluded from this definition. Claims are subject to and limit the E3 Damages and the MCC Damages as defined and as more particularly described and limited in the GSA and its exhibits.

All of Seller's right, title and interest in any and all Claims, including but not limited to:

1.  Any and all Claims of E3BFM and/or E3BFMH vis-à-vis Hawthorne-Seving, Inc. and/or any Entity related to or emanating from the specification, design, manufacture, engineering, installation, construction and/or operation of the wet-distillers grain conveyor systems installed as part of the Project.

2.  Any and all Claims of E3BFM f/k/a Nebraska BioClean-Mead, LLC and/or E3BFMH vis-à-vis Biothane Corporation, Perennial Energy, Inc. and/or any other Entity emanating from or related to services and goods provided pursuant to that particular Design and Construction Agreement dated September 4, 2005 or related to or emanating from the Boiler Explosion and Subsequent Repair Failures, the boilers or heating systems of the Project and/or the Project in general, the anaerobic digestion and methane delivery systems of the Project, the steam generation systems of the Project, including all devices, equipment and appurtenances related thereto.

3.  Any and all Claims of E3BFM and/or E3BFMH vis-à-vis Ace American Insurance Company or Zurich American Insurance Company or relating to or emanating out of any insurance policy related to the Project, and/or any portion thereof, and/or held or owned by E3BFM and/or E3BFMH including but not limited to the Claims asserted by E3BFM in E3 BioFuels-Mead, LLC (Plaintiff) v. Zurich American Insurance Company (Defendant) filed in the United States Bankruptcy Court for the District of Kansas as Case No. 07-22733, Adversary Proceeding No. 08-6010.

4.  Any and all Claims of E3BFM and/or E3BFMH vis-à-vis Skinner Tank Company or any Entity relating to the services or products related to or emanating from the purchase

order(s) and agreement(s) entered into between Skinner Tank Company and E3BFM, including but not limited to the Claims asserted by E3BFM f/k/a Nebraska BioClean-Mead, LLC in E3 BioFuels-Mead, LLC (Plaintiff) v. Skinner Tank Company (Defendant) in the U.S. District Court for the District of Nebraska, Case No. 8:06-CV-00706.

5.      Any and all Claims of E3BFM and/or E3BFMH emanating from or relating to i) the agreements to provide natural gas services to the Project and/or E3BFM between E3BFM and the company commonly referred to as Aquila and/or any Entity, and/or ii) the providing of natural gas service by Aquila and/or any Entity to the Project and/or E3BFM.

6.      Any and all Claims of E3BFM and/or E3BFMH emanating from or relating to: i) the "General Contractor Agreement" dated on or about June 30, 2006, between E3BFM and Dilling Mechanical Contractors, Inc., and/or ii) the providing of service, labor, equipment, materials, management of construction and/or any asset, consideration, property or the like by Dilling Mechanical Contractors, Inc. and/or any Entity to the Project and/or to E3BFM and/or E3BFMH.

7.      Any and all Avoidance Actions.

Exhibit 2.2

## Assumed Contracts

| Contract/Agreement/Lease | Counterparties | Default/Cure Amount |
| --- | --- | --- |
| Patent License Agreement dated December 1, 2006, as amended | IBC Patent Holding, LLC | $3,300,000, to be paid as follows: $1,500,000 shall be paid at Closing with the balance to be paid upon receipt of additional funding, anticipated to be no later than June 1, 2010 |
| Lease for 2001 Gardner Denver 125 HP Rotary Compressor | Metro Leasing 8990 W. Dodge Street Omaha, NE 68114 | None |
| Lease for Nutrient Recovery System | Trace Environmental Systems 7 Park Lake Road, #9 Sparta, NJ 07871 | None |
| Lease for 2006 PurLine Generator/Model HP20 | Water Engineering Box 157 1574 Cr. 10 Mead, NE 68041 | None |
| License Agreement dated April 20, 2005, to the extent and only to the extent the same relates to the Project. | Katzen International, Inc. | None |
| Bond Documents to which Seller is a party (excluding the Original CAFO Agreement, the Project Operating Agreement, the Marketing Agreement (E3 Marketing), or the Marketing Agreement (Aventine). | | Seller shall be deemed to have satisfied its cure obligation by Buyer's assumption of all existing and future obligations under the Bond Documents |
| Lease Agreement dated as of December 1, 2006, by and between County of Saunders, Nebraska and E3 BioFuels-Mead, LLC | | Seller shall be deemed to have satisfied its cure obligation by Buyer's assumption of all existing and future obligations under the Bond Documents |

| Contract/Agreement/Lease | Counterparties | Default/Cure Amount |
|---|---|---|
| Memorandum of Lease Agreement dated as of December 1, 2006, by and between County of Saunders, Nebraska and E3 BioFuels-Mead, LLC | | Seller shall be deemed to have satisfied its cure obligation by Buyer's assumption of all existing and future obligations under the Bond Documents |
| Base Lease Agreement dated as of December 1, 2006, by and between County of Saunders, Nebraska and E3 BioFuels-Mead, LLC | | Seller shall be deemed to have satisfied its cure obligation by Buyer's assumption of all existing and future obligations under the Bond Documents |
| Guaranty Agreement dated as of December 1, 2006, by and between Wells Fargo Bank, N.A. as Indenture Trustee and E3 BioFuels-Mead, LLC | | Seller shall be deemed to have satisfied its cure obligation by Buyer's assumption of all existing and future obligations under the Bond Documents |
| Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, in favor of Wells Fargo Bank, N.A., as Indenture Trustee, dated as of December 1, 2006 | Wells Fargo Bank, N.A. as Indenture Trustee | Seller shall be deemed to have satisfied its cure obligation by Buyer's assumption of all existing and future obligations under the Bond Documents |

Assumed Contracts shall not include the Original CAFO Agreement, the Project Operating Agreement, the Marketing Agreement (E3 Marketing), and the Marketing Agreement (Aventine).

Exhibit 3.4

## Allocation of Purchase Price

**[to be added prior to Closing]**

Exhibit 5.3

## Permitted Encumbrances Affecting Transferred Assets

Taxes from the date of Closing and thereafter, which are not yet due and payable.

Any of the Bond Documents to which Seller is a party (excluding the Original CAFO Agreement, the Project Operating Agreement, the Marketing Agreement (E3 Marketing), or the Marketing Agreement (Aventine), including, without limitation:

> Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, in favor of Wells Fargo Bank, N.A., as Indenture Trustee, dated as of December 1, 2006, recorded in Book 350, Page 1340, with the Office of the Recorder for Saunders County, Nebraska.

> Lease Agreement dated as of December 1, 2006, by and between County of Saunders, Nebraska and E3 BioFuels-Mead, LLC, recorded in [Book ___, Page ___], with the Office of the Recorder for Saunders County, Nebraska.

> Memorandum of Lease Agreement dated as of December 1, 2006, by and between County of Saunders, Nebraska and E3 BioFuels-Mead, LLC, recorded in [Book ___, Page ___], with the Office of the Recorder for Saunders County, Nebraska.

> Base Lease Agreement dated as of December 1, 2006, by and between County of Saunders, Nebraska and E3 BioFuels-Mead, LLC, recorded in [Book ___, Page ___], with the Office of the Recorder for Saunders County, Nebraska.

> Guaranty Agreement dated as of December 1, 2006, by and between Wells Fargo Bank, N.A. as Indenture Trustee and E3 BioFuels-Mead, LLC.

**[To be supplemented with prior to Closing with other easements, non-material encumbrances from title report]**

Exhibit 5.4

## Litigation

None

**Exhibit 5.6**

<u>**Environmental Matters**</u>

The assignment of certain environmental and other permits may be subject to the consent or approval of the issuing governmental authority.  Other environmental and other permits may not be transferable, in which case Buyer will need to make application for new permits in its name.

Notice dated November 2007 to State of Nebraska, Department of Environmental Quality
Notice dated November 2, 2007 to of Nebraska, Department of Environmental Quality

**[to be supplemented by Debtor Trustee prior to closing]**

Exhibit 5.7

## Violations

None, except as otherwise disclosed in Exhibit 5.6.

Exhibit 8.5

### Form of Order Approving Sale

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS
## KANSAS CITY DIVISION

| | | |
|---|---|---|
| In Re: | ) | In Proceedings Under Chapter 11 |
| | ) | |
| E3 BIOFUELS-MEAD, LLC, | ) | Case No. 07-22733-RDB |
| | ) | |
| Debtor. | ) | |

## ORDER AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND APPROVAL OF COMPROMISE

THIS MATTER having been heard on the Motion of Robert A. Carringer, Chapter 11 Trustee ("Debtor Trustee") for E3 BioFuels-Mead, LLC ("E3BFM") and E3 BioFuels-Mead Holding, LLC ("E3BFMH")(collectively, "Debtor" or "Seller") to Authorize the Sale of Assets Free and Clear of Liens, Claims and Encumbrances, Assumption and Assignment of Executory Contracts and Unexpired Leases and Approval of Compromise (the "Motion"), due and adequate notice of the Motion, the sale (the "Sale") and the compromise provided for therein having been given to all parties entitled thereto; the Court having jurisdiction over both the subject matter of and the parties to the Motion and finding that this matter is a core proceeding and the Court being fully advised in the premises,

THE COURT HEREBY FINDS that:

A.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. Proc. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. Proc. 9014.

B.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

D.  Notice of the Motion and the Hearing has been given in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Fed. R. Bankr. Proc. 2002, 6004, 6006, 9006, 9007, 9008 and 9019, the local rules of this Court and the Agreement. The foregoing notice constitutes good and sufficient notice of the Motion and the Hearing, and no other or further notice of the Motion, the Hearing or the entry of this Order need by given.

E.  A reasonable opportunity to object or to be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities, including, but

not limited to, (a) all parties who claim interests or liens upon the Transferred Assets, (b) all parties to the Assumed Contracts to be assumed and assigned to Buyer, (c) Seller's creditors and (d) any interested party to object and be heard regarding the Motion.

F.     Exigent circumstances and sound business reasons exist for Seller's sale of the Transferred Assets pursuant to the Agreement. Entry into the Agreement and consummation of the transactions contemplated thereby constitute the exercise by the Seller of sound business judgment and such acts are in the best interests of the Seller, its estate and creditors.

G.     Seller has entered into an Asset Sale and Purchase Agreement (the "Agreement") with AltEn, LLC ("Buyer"), a copy of which is available upon request, for the sale and purchase of substantially all of the Seller's assets, as defined in the Agreement (the "Transferred Assets").

H.     As a condition precedent to Buyer's obligation to consummate the transactions contemplated by the Agreement, Seller and the Debtor Trustee have entered into a Global Settlement Agreement (the "GSA") with certain other parties identified therein. A copy of the GSA is available upon request.

I.     The Agreement, GSA and transactions contemplated thereby, including certain Stipulations and Agreed Orders attached as exhibits to the GSA, constitute a settlement and compromise of disputed claims and causes of action of the Debtor, its estate, the Debtor Trustee against Dennis Langley, Earth, Energy & Environment, LLC, Mead Cattle Company, LLC, and certain other non-Debtor affiliates as more fully described in the GSA (the "E3 Non-Debtor Parties"), disputed claims and causes of action of the E3 Non-Debtor Parties against the Debtor, and disputed claims and causes of the Bond Trustee and Bondholders (as defined in the Agreement) and against the Debtor and E3 Non-Debtor Parties. The mutual releases contained in, and the Stipulations and Agreed Orders incorporated by reference into the GSA, are in turn conditioned upon Closing of the transactions contemplated by the Agreement.

J.     The consideration to be realized by Seller's estate pursuant to the Agreement is fair and reasonable, and is sufficient value for the Transferred Assets. A sale of the Transferred Assets other than one free and clear of liens, claims, and encumbrances except for Permitted Encumbrances would impact materially and adversely on Seller's bankruptcy estate, will yield substantially less value for the Seller's estate, with less certainty than the available alternatives and thus the alternative would be of substantially less benefit to the estate of the Seller. In reaching this determination, the Court has taken into account the consideration to be realized directly by the Seller. Therefore, the sale contemplated by the Agreement is in the best interests of the Seller and its estate, creditors and other parties in interest.

K.     The Agreement, and the transactions contemplated thereunder were negotiated and have been and are undertaken by Seller and Buyer at arm's length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code. As a result of the foregoing, Seller and Buyer are entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all aspects of the Agreement.

L. The compromise incorporated in the GSA and Agreement is fair and equitable, in the best interest of creditors and the bankruptcy estate, and is an appropriate exercise of the Debtor Trustee's business judgment, after due consideration of alternative courses of action. The recitals and stipulations contained in the GSA are expressly incorporated as finding of fact and conclusions of law in this Order. The compromise allows the Seller's estate to realize substantial value for its claims against the E3 Non-Debtor Parties, minimizes liabilities associated with claims by the E3 Non-Debtor Parties and Bondholders and Bond Trustee against the Seller, avoids the risks and costs associated with litigation and the risks inherent in collection. Furthermore, the Official Committee supports the compromise reflected in the Agreement.

M. In the absence of a stay pending appeal, Seller will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided in Fed. R. Bankr. Proc. 6004(g) and 6006(d).

N. The sale of the Transferred Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Seller's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Seller.

O. The Court incorporates by reference as if fully set forth herein the findings of fact and conclusions of law set forth on the record at the Hearing.

For all of the foregoing reasons and after due deliberation, the Court ORDERS, ADJUDGES, AND DECREES THAT:

1. All objections and responses, if any, concerning the Sale Motion have either been withdrawn or are overruled and denied.

2. The Motion, the Agreement, and the transactions contemplated thereby are hereby approved.

3. Pursuant to section 363(b) of the Bankruptcy Code, Seller is authorized and directed to sell the Transferred Assets to Buyer upon the terms and subject to the conditions set forth in the Agreement.

4. Pursuant to section 365 of the Bankruptcy Code, Seller is hereby authorized and directed to assign to Buyer the Assumed Contracts. Seller shall cure all defaults in any Assumed Contracts prior to or at the Closing subject to the terms of the Agreement. Buyer has provided adequate assurance of future performance of the Assumed Contracts within the meaning of section 365 of the Bankruptcy Code. Buyer shall have no liability for any amounts due under the Assumed Contracts that were due or incurred prior to the Closing (other than obligations under the Bond Documents) and the parties to such Assumed Contracts are hereby enjoined from otherwise asserting any claims against Buyer for any amounts alleged to be due or incurred under any of the Assumed Contracts prior to the Closing. Pursuant to section § 365(k) of the Bankruptcy Code, upon payment of the cure amounts due under any Assumed Contracts and the assignment of the Assumed Contracts to Buyer, Seller is relieved of any

further obligations under the Assumed Contracts (except to the extent such obligations or liabilities are preserved under the GSA and/or the Stipulations and Agreed Orders incorporated by reference in the GSA).

5.     Seller is hereby authorized and directed to take all actions and execute all documents and instruments that Seller or Buyer deem necessary or appropriate to implement and effectuate the transactions contemplated by the Agreement.

6.     Except as expressly provided in the Agreement, the sale of the Transferred Assets to Buyer shall be free and clear of liens and all other claims whatsoever pursuant to section 363(f) of the Bankruptcy Code, whether known or unknown, including, but not limited to, liens and claims of any of the Seller's creditors, vendors, suppliers, employees or lessors, and Buyer shall not be liable in any way (as a successor to the Seller or otherwise) for any claims that any of the foregoing or any other third party may have against the Seller or the Transferred Assets. Except as expressly provided in the Agreement, any and all alleged liens and claims on such Transferred Assets shall be transferred, affixed, and attached to the proceeds of such sale, with the same validity, priority, force, and effect as such liens had been upon the Transferred Assets immediately prior to the Closing. Without limiting the foregoing, the Transferred Assets shall continue to be subject to the liens held by the Bond Trustee.

7.     Subject to the payment by Buyer to Seller of the consideration provided for in the Agreement, and except as expressly provided in the Agreement, effective as of the Closing, (a) the sale of the Transferred Assets by Seller to Buyer shall constitute a legal, valid and effective transfer of the Transferred Assets and shall vest Buyer with all right, title, and interest of Seller in and to the Transferred Assets, free and clear of all liens, claims and encumbrances, including, but not limited to, the liens, claims and encumbrances of any of the Seller's creditors, vendors, suppliers, employees or lessors pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of the Assumed Liabilities by Buyer shall constitute legal, valid, and effective delegation of the Assumed Liabilities to Buyer and shall divest Seller of all liability with respect to the Assumed Liabilities, subject to cure payments.

8.     The sale of the Transferred Assets to Buyer under the Agreement will constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Kansas. The transfer of the Transferred Assets by Seller to Buyer is a legal, valid and effective transfer of the Transferred Assets notwithstanding any requirement for approval or consent of any person. All entities presently or on the Closing Date in possession of some or all of the Transferred Assets are directed to surrender possession of the Transferred Assets to Buyer on such Closing Date or at such time thereafter as Buyer may request.

9.     Buyer is hereby granted and is entitled to the protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code, including with respect to any transfer of an unexpired lease of non-residential real property and any executory contract to be assumed and assigned as part of the sale of the Transferred Assets pursuant to section 365 of the Bankruptcy Code.

10.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, all Persons are enjoined from taking any action against Buyer or the Transferred Assets to recover any claim which such Person had against Seller or the Transferred Assets, other than claims constituting Assumed Liabilities which Assumed Liabilities include the obligations owed to the Bond Trustee.

11.     Seller is authorized to assign and transfer to Buyer all of Seller's right, title and interest (including common law rights) in and to all of Seller's intangible property to be assigned and transferred to Buyer under and pursuant to the Agreement.

12.     Buyer has not assumed or otherwise become obligated, as a successor or otherwise, for any of the Seller's liabilities, debts or obligations, other than as set forth in section 2.4(a) of the Agreement. Consequently, all holders of liabilities that are not Assumed Liabilities, including holders of any liabilities, debts or obligations of the types set forth in section 2.4(b) ("Unassumed Liabilities") are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Transferred Assets to recover on account of any Unassumed Liabilities. All persons and entities holding liens or claims of any kind and nature with respect to the Transferred Assets are hereby barred from asserting or prosecuting any such lien or claim against Buyer, its successors or assigns, or the Transferred Assets for any liability, other than the Assumed Liabilities.

13.     The settlement and compromise incorporated in the Agreement, including the release of claims set forth in Section 10 of the Agreement, is approved pursuant to Bankruptcy Rule 9019.

14.     Pursuant to Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

15.     This Court shall retain exclusive jurisdiction through the earlier of dismissal or closing of this case to interpret and enforce the provisions of the Agreement, the Sale Procedures Order, and this Order in all respects and further to hear and determine all matters arising from the construction or implementation of this Order or the Agreement and any and all disputes between Seller and/or Buyer, as the case may be, and any party other than Seller that is party to, among other things, any Assumed Contracts concerning, inter alia, Seller's assumption and assignment thereof to Buyer under the Agreement; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the Agreement or this Order, such abstention, refusal or lack of jurisdiction shall have no effect upon, and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

16.     The provisions of this Order are nonseverable and mutually dependent. Nothing contained in any plan of reorganization confirmed in this case or in any order confirming such plan shall conflict with the provisions of the Agreement or this Order.

17.     This Order shall inure to the benefit of Buyer, Debtor, and their respective successors and assigns, including but not limited to any successor chapter 11 or chapter 7 trustee that may be appointed in the Seller's case and shall be binding upon any trustee, party, entity or

other fiduciary that may be appointed in connection with these cases or any other or further cases involving the Seller, whether under chapter 7 or chapter 11 of the Bankruptcy Code.

19.     Each and every federal, state, and local governmental agency, department or entity is hereby directed to accept the filing of any and all documents and instruments necessary and appropriate to implement, effectuate or consummate the transactions contemplated by the Agreement and this Order.

20.     Seller is hereby authorized and directed to execute and deliver any and all instruments as may be required to effectuate the terms of the Agreement and this Order.  Seller and each other person having duties or responsibilities under the Agreement, any agreements related thereto or this Order, and their respective directors, officers, general partners, agents, representatives, and attorneys, are authorized and empowered – subject to the terms and conditions contained in the Agreement and the schedules annexed thereto – to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement, any related agreements or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate and consummate, the Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective directors, stockholders, or partners, and with like effect as if such actions had been taken by unanimous action of the respective directors, stockholders, and partners of such entities.  Seller shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).   Seller is further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Seller may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of Kansas and all other applicable business corporation, trust, and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

21.     Pursuant to Fed. R. Bankr. Proc. 6004(g) and 6006(d), this Order shall not be stayed, and in the absence of any entity obtaining a stay pending appeal, Seller and Buyer are free to close under the Agreement at any time.   In the absence of any entity obtaining a stay pending appeal, if Seller and Buyer close under the Agreement, Buyer shall be entitled to the

protection of section 363(m) of the Bankruptcy Code as to all aspects of the transaction pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

       22.    The Agreement and any related agreements may be modified, amended or supplemented by agreement of Seller and Buyer without further action of the Court; provided that any such modification, amendment or supplement is not material and substantially conforms to and effectuates the Agreement.

       23.    The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

       24.    All entities who on the Closing Date may be in possession of some or all of the Transferred Assets are hereby directed to surrender possession of said Transferred Assets to Buyer on the Closing Date.

       25.    All amounts, if any, to be paid by Debtor pursuant to the Agreement constitute administrative expenses under sections 503(b) and 507(a)(1) of the Bankruptcy Code and are immediately payable if and when such obligations arise under the Agreement.

Date: _____, 2009

                               UNITED STATES BANKRUPTCY JUDGE

ORDER SUBMITTED BY:

*Exhibit 8.10*

# GLOBAL SETTLEMENT, STIPULATION

# AND RELEASE AGREEMENT

December 17, 2009

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................................. 2
    1.1    Glossary and Interpretation ............................................................... 2

ARTICLE II GENERAL RELEASES ............................................................................. 3
    2.1    Release of E3 Non-Debtor Parties ....................................................... 3
    2.2    Release of Bondholders, Bond Trustee ............................................... 3

ARTICLE III DISMISSAL OF ACTIONS AND PROCEEDINGS ........................... 4
    3.1    Dismissal ........................................................................................... 4
    3.2    Standstill ........................................................................................... 4

ARTICLE IV LIMITED RELEASE AND RESERVATION OF RIGHTS AGAINST
    DEBTORS ................................................................................................. 4
    4.1    Limited Release/Reservation of Rights Against Debtors ................... 4

ARTICLE V MISCELLANEOUS ................................................................................. 4
    5.1    Assumption and Assignment of Patent License ................................. 4
    5.2    Agreement Contingent upon Closing of the Sale Transaction ........... 4
    5.3    No Admission ..................................................................................... 5
    5.4    Authority ........................................................................................... 5
    5.5    Joint Preparation .............................................................................. 5
    5.6    Applicable Law .................................................................................. 5
    5.7    Multiple Originals ............................................................................. 5
    5.8    Waiver ............................................................................................... 5
    5.9    Acknowledgement .............................................................................. 5
    5.10    Complete Agreement ......................................................................... 5
    5.11    Agreement Subject to Laws ............................................................... 6
    5.12    Amendments ...................................................................................... 6
    5.13    Representation By Independent Counsel ........................................... 6
    5.14    Further Assurances ........................................................................... 6

i

# EXHIBITS

**Exhibit 1.1**          **Glossary**

**Exhibit 4.1(a)**       **Stipulation and Agreed Order re: E3 Damages**

**Exhibit 4.1(b)**       **Stipulation and Agreed Order re: MCC Damages**

## GLOBAL SETTLEMENT, STIPULATION AND RELEASE AGREEMENT

The Global Settlement, Stipulation, and Release Agreement ("**GSA**" or "**Agreement**") is entered into this 17th day of December, 2009, by and between the parties to this Agreement, identified on the signature page hereto (each, a "**Party**" and collectively, the "**Parties**").

## RECITALS

**WHEREAS**, E3 BioFuels-Mead, LLC ("**E3BFM**") owns a facility (the "**Project**") for the production of denatured, anhydrous ethanol, alcohol, distillers grains, methane, aqueous ammonia, compost and certain other products on real property located in Mead, Nebraska.

**WHEREAS**, the Project was designed as a "closed loop" system with an adjacent cattle feed lot, owned and operated by its non-debtor sister company Mead Cattle Company, LLC ("**MCC**"). The closed loop system is designed so that manure from the feedlot is processed in an anaerobic digestion system and used to fuel the plant. In turn, wet distillers grain or wet cake, a by-product of ethanol production, is fed to the cattle.

**WHEREAS**, Earth, Energy & Environment, LLC ("**E3**"), through its subsidiaries, is the controlling owner of both E3BFM and MCC.

**WHEREAS**, construction of the Project was financed in part with funds from bonds issued by Saunders County, Nebraska (the "**Bonds**"). Wells Fargo Bank, N.A. is the Bond Trustee for the Bonds ("**Bond Trustee**"). OppenheimerFunds, Inc. holds approximately $45 million in non-taxable bonds and CIT Group/Equipment Financing, Inc. holds approximately $5 million in taxable bonds. The Bonds represent E3BFM's most significant financial obligation.

**WHEREAS**, E3BioFuels-Mead, LLC, and its parent holding company, E3BioFuels-Mead Holding, LLC ("**E3BFMH**", and together with E3BFM, the "**Debtors**") filed Chapter 11 petitions on November 30, 2007 with the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**"). The Debtors operated as debtors-in-possession under the management of Dennis Langley ("**Langley**") until September 25, 2008, when Robert A. Carringer was appointed as Chapter 11 trustee ("**Debtor Trustee**").

**WHEREAS**, an Official Committee of Unsecured Creditors (the "**Creditors Committee**") has been appointed in the Debtors' case.

**WHEREAS**, both the Debtors and Debtor Trustee have focused their efforts on a sale and/or recapitalization of the Debtors' assets, and investigation and pursuit of various litigation claims related to mechanical and equipment failures at the plant against insurance providers and other parties. The Project is not currently operational.

**WHEREAS**, numerous disputes have arisen between the parties in interest in the Bankruptcy Case, which have hindered the Debtors' ability to restructure its debt and/or sell its assets.

**WHEREAS**, among these disputes are claims arising under a CAFO and Solid Waste Disposal Agreement (the "**Original CAFO Agreement**") between E3BFM and MCC. The Bond Trustee has been authorized by the Bankruptcy Court to pursue the Debtor's claims against MCC under the Original CAFO Agreement on behalf of the Debtor's estate, and the Bond Trustee has initiated arbitration proceedings against MCC (the "**Arbitration Proceeding**").

**WHEREAS**, the Bond Trustee has asserted claims against E3 under a Construction Completion Guaranty, executed by E3 in favor of Bond Trustee in connection with the Debtor's ethanol plant, in an adversary proceeding entitled *Wells Fargo Bank, N.A. as Bond Trustee v. Earth, Energy & Environment, LLC*, Adversary Case No. 08-06104 (the "**Guaranty Action**"). The Bond Trustee contends the Plant was not completed when or as described in the Bond documents and E3 failed to honor its obligations under the guaranty. E3 contends no obligations are due under the Guaranty. Prior to the filing of the bankruptcy, an explosion damaged one of the plant's two boilers.

**WHEREAS**, the Debtor Trustee brought an adversary proceeding in the Bankruptcy Court, Case No. 09-6163, against Langley, MCC, E3 MCC and various other E3 affiliates and their present and former officers and directors (the "**E3 Avoidance Action**"), asserting various claims including claims for avoidance of transfers under Chapter 5 of the Bankruptcy Code.

**WHEREAS**, pursuant to the terms of a Patent License Agreement, E3BFM licenses certain patent technology from Patent Holdco, a patent holding company ultimately owned 50% by E3 and 50% by Prime BioShield, LLC. Patent HoldCo asserts that E3BFM is liable for payment of patent license fees for 2006, 2007, 2008 and 2009, which must be paid as a condition of any assignment of the license rights.

**WHEREAS**, E3 asserts that: (i) prior to the Bankruptcy Case, it advanced in excess of $5 million to Debtors for attempted Start Up and operating expenses, and (ii) during the Bankruptcy Case, E3 advanced in excess of $2 million to the Debtor for maintenance expenses. In addition, E3 and certain other E3 Non-Debtor Parties assert other claims against the Debtors, arising prior to the bankruptcy filing.

**WHEREAS**, the Parties have arrived at a settlement of their disputes, the terms of which are set forth herein, in that certain Asset Sale and Purchase Agreement between the Debtors and AltEn, LLC (the "**Sale Agreement**") dated as of the same date as this Agreement as well as certain related documents. This settlement shall be contingent upon entry of the Sale Order and consummation of the transactions contemplated therein.

**NOW THEREFORE**, for and in consideration of the covenants and undertakings hereinafter set forth, and for other good and valuable consideration, which each Party hereby acknowledges, the Parties agree to the following:

## ARTICLE I

## DEFINITIONS

**1.1    Glossary and Interpretation.** Exhibit 1.1 hereto, the terms of which are incorporated herein by reference, shall constitute the glossary of this Agreement ("**Glossary**"),

2

and any and all such terms when used in this Agreement, and/or any of its exhibits (which are incorporated herein by reference thereto) shall be used in accordance with the definitions ascribed to such terms in the Glossary. In addition to definitions, the terms defined in the Glossary may contain material and substantive language, provisions and/or terms of and/or to this Agreement, and are to be read as any other term, paragraph, sentence, section, subsection, provision, etc. of this Agreement. The headings of the Articles and Sections of this Agreement are for convenience only and shall not be considered in construing or interpreting any of the terms or provisions hereof. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. The use of the words "or," "either," and "any" shall not be exclusive. Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict. Terms not set forth in Exhibit 1.1 but otherwise defined in the body of this Agreement shall have the specific meanings attributed to them in the text. The phrase "including" shall be deemed to be followed by "without limitation", unless it is in fact followed by language having similar meaning (e.g., "but not limited to") in which case no additional imputation is necessary. Terms in the singular shall have the same meanings when used in the plural and vice versa.

## ARTICLE II

## GENERAL RELEASES

**2.1 Release of E3 Non-Debtor Parties.** Effective as of the Closing and after entry of the Sale Order, the Bond Trustee on behalf of itself and the Bondholders, Debtor Trustee and Debtors together with their parents, subsidiaries, affiliates, agents, employees, officers, successors and assigns, release the E3 Non-Debtor Parties from any and all liabilities, actions, rights of action, Avoidance Actions, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, that they have or may have against any of the E3 Non-Debtor Parties, including but not limited to claims asserted or which could have been asserted in the Guaranty Action, the Arbitration Proceeding and the E3 Avoidance Action.

**2.2 Release of Bondholders, Bond Trustee.** Effective as of the Closing and after entry of the Sale Order, the E3 Non-Debtor Parties release the Bondholders, the Bond Trustee and the Debtor Trustee together with their parents, subsidiaries, affiliates, agents, employees, officers, successors and assigns from any and all liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time.

3

## ARTICLE III

## DISMISSAL OF ACTIONS AND PROCEEDINGS

**3.1     Dismissal.**  Within 10 days after Closing and after entry of the Sale Order, the Bond Trustee shall dismiss with prejudice its claims against E3 in the Guaranty Action, and the Bond Trustee and/or Debtor Trustee, as applicable, shall dismiss with prejudice its claims against MCC in the Arbitration Proceeding, and the Debtor Trustee shall dismiss with prejudice its claims against those E3 Non-Debtor Parties named as defendants in the Avoidance Action.

**3.2     Standstill.**  From the date of execution of this Agreement through Closing (or termination of the Sale Agreement in accordance with its terms), the Parties agree that no further action shall be taken in the Guaranty Action, the Arbitration Proceeding or the Avoidance Action, other than to advise the applicable court or tribunal of the status of the matter or to extend, seek or obtain extensions or continuances of litigation deadlines or hearings in such actions or proceedings.

## ARTICLE IV

## LIMITED RELEASE AND RESERVATION OF RIGHTS AGAINST DEBTORS

**4.1     Limited Release/Reservation of Rights Against Debtors**.  The E3 Non-Debtor Parties waive any right to a distribution from the Debtors' estates, but do not release and expressly reserve any and all claims and causes of action they may have against the Debtors, including but not limited to the stipulations and obligations contained in Exhibits 4.1(a) and 4.1(b) hereto.  Within 10 days after Closing and after entry of the Sale Order, the Debtor Trustee shall submit the stipulations and obligations contained in Exhibits 4.1(a) and 4.1(b) to the Bankruptcy Court for entry.  The stipulations and obligations contained in Exhibits 4.1(a) and 4.1(b) hereto are expressly incorporated by reference herein, to the extent the same are approved by the Court.   The claims reserved pursuant to this Section shall not give rise to any cause of action or right of recovery, by offset or otherwise, against AltEn, LLC, its assigns or any other third party who purchases or owns the Project, or those parties released pursuant to the terms of this Agreement.

## ARTICLE V

## MISCELLANEOUS

**5.1     Assumption and Assignment of Patent License**.  The Debtors shall assume and assign to AltEn, LLC all of its right, title and interest in the Patent License Agreement effective upon Closing and payment of the Cure Amount for the Patent License Agreement in accordance with the Sale Agreement as the cure amount is amended by the parties.

**5.2     Agreement Contingent upon Closing of the Sale Transaction**.  This Agreement and the Stipulations and Agreed Orders to be attached hereto as Exhibits 4.1(a) and 4.1(b), are contingent upon consummation of the transactions contemplated by the Sale Agreement, entry of the Sale Order, and the consummation of the closings described in the Bond Purchase

4

Agreements. If the Sale and closings described in the Bond Purchase Agreements are not consummated, this Agreement and the Stipulations and Agreed Orders attached as Exhibits 4.1(a) and 4.1(b), shall not be effective, and none of the Parties shall be deemed to release or waive any claims or defenses by and between the Parties (or the Parties' Affiliates) released hereunder.

**5.3    No Admission**. The intention, understanding and agreement of the Parties hereto is that this Agreement constitutes a complete and final settlement between the Parties hereto as described herein. Each Party acknowledges its understanding that this Agreement is a compromise of disputed claims, and that by entering into this Agreement, it is agreed that no party is making any admission or concession of any factual or legal contention, except as expressly set forth herein. To the extent this Agreement is not approved by the Bankruptcy Court or a court of appropriate jurisdiction, the statements set forth in this Agreement shall be null and void, have no force or effect, and may not be used by any party in any present or future litigation.

**5.4    Authority**. Each of the Parties warrant that they are fully empowered and authorized to execute this Agreement and that the person signing on behalf of each is fully authorized to do so.

**5.5    Joint Preparation**. All of the Parties have cooperated and participated in the drafting and preparation of this Agreement. Accordingly, the Parties agree that this Agreement shall not be construed or interpreted in favor of or against any Party by virtue of the identity of its preparer.

**5.6    Applicable Law**. This Agreement shall be construed and interpreted according to the laws of the State of Kansas.

**5.7    Multiple Originals**. This Agreement may be executed in any number of counterparts, each of which when so executed shall be an original, and all such counterparts together constitute the same instrument. This Agreement or any document executed in connection herewith shall be binding upon such signator party, if said signature is delivered by email, facsimile or other like transmission.

**5.8    Waiver**. No waiver by any Party hereto of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be deemed or construed as a further or continuing waiver of such condition or breach or waiver of any other or subsequent condition of the breach or of any other term, covenant, representation or warranty contained in this Agreement.

**5.9    Acknowledgement**. By signing this Agreement, the Parties each acknowledge the following: that they have read the Agreement; that they understand the Agreement; that their legal counsel participated in the negotiation of this Agreement; and that they have consulted with legal counsel or have had the opportunity to do so prior to executing this Agreement and sign this Agreement knowingly and voluntarily.

**5.10    Complete Agreement**. This Agreement, along with the exhibits hereto, Sale Order and the Sale Agreement constitute the entire agreement between the parties as to the matters discussed herein and supersedes any and all prior and contemporaneous agreements,

representations, and understandings of the parties. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by the parties hereto which are directly affected by such modification or amendment, and no parole or other evidence may be introduced for the purpose of modifying, explaining (except for the explanation of ambiguities), or contradicting any of the terms and provisions set forth herein.

**5.11    Agreement Subject to Laws.**    If any provision of this Agreement or the application thereof to any party or any circumstance shall be found to be contrary to, or inconsistent with or unenforceable under any governing State and/or Federal law, rule, regulation or order, the latter shall control and this Agreement shall be deemed modified accordingly; but the remainder of this Agreement and the application of such provisions to the other parties or circumstances shall not be affected thereby, and in all other respects the Agreement shall continue in full force and effect.

**5.12    Amendments.**    Except as otherwise provided for herein, any changes in the provisions of this Agreement made subsequent to its execution shall be made by formal, written and mutually executed amendments. It is stipulated that oral modifications and amendments hereto or other parole evidence shall not be binding and that no evidence of oral amendments or modifications shall be admissible during arbitration or other adjudication.

**5.13    Representation By Independent Counsel.**    The parties were represented by independent legal counsel and other professional counsel and mutually participated in the drafting of this Agreement; therefore, the common law principle of legal construction that the document is to be strictly construed against the drafting party is expressly waived by the parties hereto and the Arbitrators and/or any Count of proper jurisdiction are expressly requested and instructed not to apply such principle in arbitrating or adjudicating any conflict between the parties.

**5.14    Further Assurances.**    The parties hereby agree to execute, acknowledge and deliver to each other any further writings, documents, transfers, acknowledgments, instruments, powers of attorney, authorizations, filings, applications, reports, etc. that may be reasonably required to give full force and effect to the provisions of this Agreement, and to take such further actions reasonably required in fulfillment of obligations set forth herein or in furtherance of the intent hereof.

6

IN WITNESS WHEREOF, the parties have subscribed their names on the date and year written below.

E3 BIOFUELS-MEAD, LLC AND E3 BIOFUELS-MEAD HOLDING, LLC

By: _____

Robert A. Carringer, Chapter 11 Trustee

Date: _____

7

ROBERT A. CARRINGER, CHAPTER 11 TRUSTEE FOR
E3 BIOFUELS-MEAD, LLC AND E3 BIOFUELS- MEAD
HOLDING, LLC

Date: _____

By: _____
Name: _____
Title: _____

8

**WELLS FARGO BANK, N.A., BOND TRUSTEE**

Date: _____

By: _____
Name: _____
Title: _____

9

EARTH, ENERGY & ENVIRONMENT, LLC ON
BEHALF OF OTHER E3 NON-DEBTOR PARTIES

Date: _____     By: _____
                            Name: _____
                            Title: _____

**EXHIBIT 1.1**
**GLOSSARY**

In addition to definitions, the terms defined in the Glossary may contain material and substantive language, provisions and/or terms of and/or to the GSA, and are to be read as any other term, paragraph, sentence, section, subsection, provision, etc. of this GSA.

"**Affiliate**" as applied to any Entity, means any other Entity directly or indirectly controlling, controlled by or under common control with that Entity. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" or "under common control") as applied to any Entity, means the possession, either directly or indirectly, of the power to direct or cause the direction of the management and policies of that Entity, whether through ownership of voting securities, by contract or otherwise. For purposes of this definition, a person shall be deemed to be controlled by such Entity if such Entity possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors of such Entity.

"**Avoidance Actions**" means any and all avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law, including, without limitation, all rights and avoidance claims of Debtors arising under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Case**" means Case Nos. 07-22733-RDB and 07-22734 filed by the Debtors in the Bankruptcy Court.

"**Bankruptcy Code**" means the United States Bankruptcy Code (Title 11 of the United States Code) as in effect on the date hereof.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Kansas (Kansas City).

"**Bond Purchase Agreements**" means that certain Forbearance and Bond Option Agreement between Mead OPP Bond Acquisition, LLC and OppenheimerFunds, Inc. and that certain Bond Purchase Agreement between Mead CIT Bond Acquisition, LLC and CIT Group/Equipment Financing, Inc.

"**Bonds**" means, collectively, the County of Sanders, Nebraska $45,745,000 Tax-Exempt Industrial Development Revenue Bonds (E3 BioFuels-Mead, LLC Project) Series 2006A, and the County of Saunders, Nebraska $4,755,000 Tax-Exempt Industrial Development Revenue Bonds (E3 BioFuels-Mead, LLC Project) Series 2006B, issued in connection with the Project.

"**Bondholders**" means the holders of the Bonds.

"**Bond Documents**" means that certain Lease Agreement, Base Lease Agreement, Guaranty Agreement, Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, and various other agreements entered into by Seller in connection with the Bonds.

"**Bond Trust Indenture**" means the Trust Indenture dated as of December 1, 2006 between Bond Indenture Trustee and the County of Saunders, Nebraska, relating to the Bonds.

"**Bond Trustee**" means Wells Fargo Bank, National Association, in its capacity as indenture trustee pursuant to the Bond Trust Indenture.

"**Causes of Action**" means any action, cause of action, liability, obligation, right to legal or equitable remedies, suit, debt, sum of money, damage, judgment, claim or demand whatsoever, whether known or unknown, matured or unmatured, disputed or undisputed and whether asserted or assertable directly or derivatively, whether asserted or which could be asserted, in law, equity or otherwise, whether arising under Chapter 5 of the Bankruptcy Code or arising under any other legal or equitable theory, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Bankruptcy Case.

"**Closing**" means consummation of all of the transactions contemplated by the Sale Agreement, including consummation of those transactions set forth in the Bond Purchase Agreements.

"**Closing Date**" means that date when all of the transactions contemplated by the Sale Agreement have been consummated.

"**Debtors**" shall mean E3 BioFuels-Mead, LLC and E3 BioFuels-Mead Holding, LLC.

"**Debtor Trustee**" means the duly appointed and acting Chapter 11 Trustee for the Debtors.

"**E3**" means Earth, Energy & Environment, LLC, a Kansas limited liability company.

"**E3 Non-Debtor Parties**" shall include Langley, E3, E3BF, E3 MarCo, E3 OpCo, E3PBS, MCC, E3Patent, Patent Holdco, Quivira, GEA, LG, and MRG. In addition, the E3 Non-Debtor Parties shall include any Entity in which E3 or Langley has a direct or indirect pecuniary or equitable interest of equal to or more than fifty percent (50%) [except the Debtors (E3BFM and E3BFMH)], as well as any and all of the E3 Non-Debtor Parties' respective former or present directors, officers, employees, shareholders, partners, members and attorneys, and their respective Affiliates, including but not limited to Lynette Shaw, Andrew Whipple, Tino Monaldo, Nage Damas and Cam-T Enterprises, Inc. dba Construction Concepts.

"**E3BF**" means E3BioFuels, LLC, a Delaware limited liability company.

"**E3 MarCo**" means E3 Marketing, LLC, a Delaware limited liability company.

"**E3 OpCo**" means E3 Operating Company, LLC, a Delaware limited liability company.

"**E3PBS**" means E3PBS HoldCo, LLC, a Delaware limited liability company.

"**E3Patent**" means E3 Patent Holding, LLC, a Delaware limited liability company.

"**Entity**" means any natural persons, corporations of any type, limited liability companies, limited partnerships general partnerships, associations, joint venture, trusts, trust companies, trustees (including the Debtor Trustee and the Bond Trustee), estates or other organizations, whether or not legal organizations.

"**GEA**" means Gaelic Wings Aviation, LLC.

"**Langley**" means Dennis M. Langley, his heirs, legatees and/or assigns.

"**LG**" means The Langley Group, Ltd.

"**MCC**" means Mead Cattle Company, LLC, a Nebraska limited liability company.

"**MRG**" means Management Resources Group, LLC.

"**Quivira**" means Quivira Realty, Inc.

"**Patent HoldCo**" means IBR Patent Holdco, LLC, a Delaware limited liability company.

"**Patent License Agreement**" means that certain License Agreement, dated December 1, 2006, by and between E3BFM and IBR Patent Holding, LLC, as amended, and assumed by E3BFM with approval of the Bankruptcy Court, and assigned to AltEn, LLC at Closing.

"**Petition Date**" means November 30, 2007.

"**Sale Agreement**" Asset Sale and Purchase Agreement between the Debtors and AltEn, LLC.

"**Sale Order**" means the final, non-appealable order approving this Agreement, the Sale Agreement and the transactions contemplated thereunder.

"**Tax Code**" means Title 26 of the United States Code.

**EXHIBIT 4.1(a)**

**Stipulation and Agreed Order re: E3 Damages**

# EXHIBIT 4.2(b)

**Stipulation and Agreed Order re: MCC Damages**